UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Deloris Janette Williams | ) Court File No.: 2:18-cv-01369-RMG-MGB |
| Plaintiff, | ) **AMENDED COMPLAINT** |
| v. | ) **JURY TRIAL DEMANDED** |
| Molina Healthcare of South Carolina, LLC, | ) |
| Defendant. | ) |

## COMPLAINT

As and for her Complaint, Plaintiff Deloris Janette Williams alleges the following against Defendant Molina Healthcare of South Carolina, LLC:

## STATEMENT OF CLAIM

1. Molina Healthcare of South Carolina, LLC (herein "Molina") is in the business of providing healthcare services and health information management in or near Charleston, South Carolina. Plaintiff Deloris Janette Williams ("Janette") brings this action to recover damages arising out of a hostile work environment based on her race, and her wrongful termination based on her race and in violation of public policy.

## PARTIES

2. Janette is domiciled in the State of South Carolina, as she permanently resides at 1447 E. Montague Avenue, North Charleston, South Carolina 29405.

1

3. Molina is a limited liability company organized under the laws of the State of South Carolina.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Janette has alleged causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

5. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper under § 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in the District of South Carolina, Charleston Division.

7. Janette has exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC") and has received an EEOC Notice of Right to Sue.

## FACTS

8. Molina is a private Medicaid provider, providing healthcare services to indigent people and administering Medicaid payments to same.

9. Upon information and belief, those healthcare services are funded in part by the State of South Carolina.

10. Janette was recruited by former Molina supervisor, Kimberly Duncan (herein "Ms. Duncan"), because of Janette's more than two-decade's worth of

experience in medical billing, ten of which involved supervision of medical billing departments.

11. While she was recruiting Janette, Ms. Duncan voiced concerns to Janette about Molina's processing of medical insurance appeals, which Ms. Duncan believed to potentially be illegal.

**Illegal Medical Billing**

12. Once Janette began employment with Molina, she observed widespread discrepancies in its billing processes, which, given her lengthy experience in the field, she believed was potentially illegal and costly to the State of South Carolina.

13. These discrepancies included but were not limited to:

    - Molina had a backlog of 4,000 appeals dated from as early as 2014;
    - Healthcare providers were forced to request payment numerous times;
    - Those same providers were often paid numerous times for the same services;
    - The same appeal would appear in the system numerous times under a different appeal number;
    - Those same appeals were being paid multiple times under those different appeals numbers; and
    - Indigent patients were receiving bills for medical services.

14. Janette reported these discrepancies to Dora Wilson, a supervisor, to no avail.

15. Janette also reported these discrepancies to Jamella Beans-Muhammad in the Compliance Department, again to no avail.

16. In 2016, Ms. Duncan was terminated and replaced with Janet Moore (herein "Ms. Moore"), a Caucasian.

17. Ms. Moore immediately instituted a policy requiring that she alone would assign which appeals should be processed by individual employees.

18. Additional compliance issues became apparent to Janette, including but not limited to the following:

    - There was a vast network of sub-folders on the intranet of Molina's facility in Charleston where Ms. Moore placed hundreds of stale claims that went unassigned, even after Janette brought the unaddressed claims to Ms. Moore's attention at a billing department meeting;

    - As a matter of course throughout her previous 20 years of billing experience, appeals should have been processed within 3-5 business days; however, throughout 2016-2017, Ms. Moore consistently assigned Janette appeals to process from 2014; and

    - Raising concerns of potential violations of the Health Insurance Portability and Accountability Act ("HIPAA"), Ms. Moore kept every patient's file within a single folder, making it incredibly vulnerable to cybersecurity attacks.

**Termination in Violation of Public Policy**

19. As part of the standard appeals process, as required under the contract between Molina and the State of South Carolina, once an appeal from a provider came in, Molina would issue a letter to the provider stating that the appeal had been received and was being processed (herein the "Appeal Received Letter").

20. Some important purposes of the Appeal Received Letter were:

    - Streamlining the appeals process on both ends (by eliminating the need for providers to appeal multiple times);

    - Avoiding a backlog of appeals; and

4

- Avoiding redundant multiple payments to providers.

21. Laci Thompson, Ms. Moore's assistant, was exclusively in charge of printing the Appeal Received Letters and sending them to providers.

22. Molina's corporate office relied on a spreadsheet Ms. Moore had created and personally maintained to track the total number of appeals that came in, the date an appeal came in and was processed, and the length of time it took process each appeal.

23. At some point in 2016, Molina's corporate office requested the Charleston office begin utilizing its nationwide "Appeals and Grievances" database ("A&G database").

24. Ms. Moore enlisted Janette's assistance with uploading the closed appeals into the A&G database.

25. As part of the process of uploading closed appeals, the A&G database required a series of answers to such questions as:

- When did the appeal come in?
- When was the appeal processed?
- When was the Appeal Received Letter sent?

26. In order to enter in the proper date for the Appeal Received Letter, Janette would check the physical letter Laci Thompson had sent, and enter that date into the A&G database.

27. Seeing this, Ms. Moore specifically instructed Janette "don't pay attention to the date on the letter. Molina isn't concerned about the exact date of the letter—if it

5

says the appeal came in on a Wednesday, just say the letter went out on that Thursday or Friday."

28. Janette understood this to mean that Ms. Moore was instructing her to misrepresent the length of time it took to address and process the appeals to corporate.

29. Not willing to fraudulently alter the dates she was entering into the A&G database, Janette continued to put the correct dates into the database.

30. Ms. Moore subsequently reprimanded Janette for entering the correct dates by formally issuing Janette a write-up.

31. Following this write up, Janette complained to April Krajewski in Human Resources, and then immediately complained to Jamella Beans-Muhammad in the Compliance Department.

32. Janette was written up by Ms. Moore for being away from her desk when she was properly reporting her concerns to the Compliance Department.

33. Notwithstanding Janette's timely complaints to the Human Resource and Compliance Departments, Molina took no remedial or disciplinary actions against Ms. Moore, and the database discrepancies were allowed to continue.

34. On March 6, 2017, Janette filed a whistleblower complaint with the Office of the Attorney General with regard to the medical insurance fraud.

35. On September 14, 2017, Molina terminated Janette.

**Disparate Treatment Based on Race**

36. Molina's "Policy Against Unlawful Harassment, Discrimination and Retaliation" states in pertinent part:

Unlawful discrimination is adverse treatment of employees that is motivated by the employee's Protected Characteristic(s)…

Employees, supervisors or managers who become aware of any violation of this policy must immediately advise the Human Resources Department or his or her immediate supervisor, who must then immediately inform the Human Resources Department.

Molina Employee Manual, p. 9.

37. Upon her appointment to the role of Janette's supervisor, almost immediately, Ms. Moore began treating Janette differently than her white co-workers, and making thinly-veiled racist remarks.

38. In one instance, on or around June 14, 2017, Ms. Moore circulated an email to featuring a picture of a young black office worker apparently sleeping at his desk, commenting "I wish I had his job."

39. In another instance in 2016, Janette stated she would not attend Molina's office staff field trip to a local plantation historically worked by slaves. To this, Ms. Moore responded "I would have thought you would be used to that by now."

40. Janette reported Ms. Moore's consistent hostile and abusive behavior, and her belief that this mistreatment was racially-motivated, to Molina's local Human Resource department on numerous occasions verbally and over email, but no actions, let alone remedial actions, were taken.

41. Janette then escalated her complaints to Molina's corporate Head of Human Resources in California, Mary Hardy (herein "Ms. Hardy.")

42. Ms. Hardy advised Janette that an investigation would be initiated.

43. After an initial investigation, Ms. Hardy advised Janette that her allegations of Ms. Moore's mistreatment of Janette, were "founded."

44. Notwithstanding Ms. Hardy's credence to Janette's allegations, Molina took no remedial or disciplinary actions against Ms. Moore, and the abusive treatment continued.

45. Because Molina took no action to stem the discriminatory and harassing treatment, Janette requested permission to apply for a position in another department to remove herself from the hostile work environment under Ms. Moore.

46. On or around April 2016, Dora Wilson, Ms. Moore's supervisor, granted Janette permission to do so.

47. Janette applied for the Credentialing Department position, for which she was clearly qualified, given her decade of experience doing credentialing.

48. Despite her qualifications, a Caucasian with less experience than Janette was given the position, and Janette was forced to remain in the hostile environment.

49. Despite the espoused "Policy Against Unlawful Harassment, Discrimination and Retaliation," Molina allowed Ms. Moore's abuse of and hostility toward Janette to continue unabated.

50. Compounding the situation was that Janette was forced to observe Molina's disparate treatment of other black employees, such as when Molina refused two black employees' requests to arrive early at 7:30 a.m. and leave early at 4:00 p.m. to pick up their children from daycare, while simultaneously granting their white co-worker's request to arrive early at 7:30 a.m. and leave early at 4:00 p.m. to tend to her farm animals.

51. Janette complained to Ms. Krajewski in Human Resources verbally and via email about this disparate treatment.

52. Despite having notice of such disparate treatment, Molina took no action to remedy the situation.

53. On or around June, 2017, Molina announced a "restructuring" of its facilities, a process it dubbed "Project Nickels."

54. On or around September 14, 2017, Molina terminated a number of employees in Janette's department, all of whom were black, while retaining white employees with significantly less experience than Janette.

### CAUSE OF ACTION ONE:
### WRONGFUL TERMINATION IN VIOLATION OF
### SOUTH CAROLINA PUBLIC POLICY

55. Janette restates and re-alleges Paragraphs 1 through 54 of her Complaint as if set forth fully herein.

56. Under South Carolina law, an employee is wrongfully terminated and not subject to the employment at-will doctrine when she is required by the employer to violate the clearly enunciated public policy of the State.

57. Reflecting the public policy of the State, South Carolina criminalizes and punishes medical insurance fraud.

58. After her reports to Molina's Human Resources and Compliance Departments about Molina's potentially illegal and fraudulent treatment and deletion of medical insurance appeals, Janette was forced by Molina to become complicit in the process by either ignoring it or covering it up in order to remain employed.

59. After providing Human Resources an opportunity to address the issue, Janette was instead pretextually "laid off" (despite her superior experience and credentials) and therefore wrongfully terminated for failing to be an accomplice in the potentially illegal conduct.

60. Because Janette was terminated, at least in part, for refusing to aid and abet the potentially illegal conduct in violation of clearly enunciated public policy, she is entitled to compensatory damages (including for emotional pain and suffering) in the exact amount to be proven at trial.

### CAUSES OF ACTION TWO AND THREE: VIOLATION OF 42 U.S.C. § 2000e et seq. ("TITLE VII"): EMPLOYMENT DISCRIMINATION ON BASIS OF RACE AND HOSTILE WORK ENVIRONMENT

61. Janette restates and re-alleges Paragraphs 1 through 60 of her Complaint as if set forth fully herein.

62. Title VII prohibit employers from discriminating against employees on the basis of race.

63. As an African-American female, Janette is a member of protected classes.

64. With over two decades of experience in medical billing and administration, Janette was qualified for her position of Provisional Network Analyst III (medical billing).

65. Under her former supervisor, Kimberly Duncan, an African-American, Janette was exceeding Molina's expectations in this position, as evidenced by her positive performance evaluations.

66. Despite her qualifications and satisfactory performance, Janette began receiving negative performance reviews under her new supervisor, Ms. Moore, a Caucasian, beginning in 2016.

67. Janette was exposed to the following discriminatory actions based on race:

    - On or around June 14, 2017, Ms. Moore targeted a black employee for ridicule by circulating an email featuring a photograph of him apparently sleeping at his desk, commenting "I wish I had his job"; and

    - In 2016, Janette indicated she would not attend Molina's office staff field trip to a local plantation historically worked by slaves. To this, Ms. Moore responded "I would have thought you would be used to that by now."

68. Janette also suffered a hostile work environment, including observing other black employees' disparate treatment based on race when Molina allowed a white employee to arrive and leave early for work to tend to her farm animals, while disallowing similarly-situated black employees from the identical schedule accommodation to pick up their children from daycare.

69. The discrimination based on Janette's race resulted in the following tangible adverse employment actions:

- Despite her decade of experience in credentialing, Janette was denied the MSC Specialist Provider position for which she applied, and the job was given to a white co-worker with less experience; and

- Janette was ultimately terminated along with only black co-workers in her department, while white employees in the department, most of whom had far less experience in medical billing than Janette, were retained.

70. Molina had actual knowledge of the discriminatory treatment Janette suffered and observed because Janette complained verbally and over email to Human Resources on numerous occasions about it; Ms. Moore—a manager—circulated the racist email to management; Molina management granted a white employee a schedule accommodation while refusing to permit similarly-situated black employees the identical accommodation; and Molina knowingly terminated only black employees and retained less experienced white employees in Janette's department.

71. Janette was emotionally harmed and damaged by Molina's discriminatory actions in violation of Title VII in an amount to be determined at trial, as evidenced by her need to medically treat the resulting stress with an anxiety-reducing prescription medication, and taking several days off work.

72. Janette was economically harmed and damaged by Molina's discriminatory actions in violation of Title VII in an amount to be determined at trial.

73. Because Molina was fully aware of this discrimination, its violations were malicious and reckless, entitling Janette to punitive damages and recovery of reasonable attorney's fees and costs.

**CAUSES OF ACTION FOUR AND FIVE:**
**VIOLATION OF 42 U.S.C. § 1981, INTENTIONAL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON RACE**

74. Janette restates and re-alleges Paragraphs 1 through 73 of her Complaint as if set forth fully herein.

75. 42 U.S.C. § 1981 likewise prohibits employers from discriminating against employees on the basis of race.

76. Under Fourth Circuit precedent, an at-will employment relationship is contractual in nature and may support a claim under § 1981.

77. Molina exercised the following unwelcome discriminatory actions toward Janette:

- On or around June 14, 2017, Ms. Moore maliciously circulated an email featuring a photograph of a black employee apparently sleeping at his desk, commenting "I wish I had his job";

- In 2016, Janette stated she would not attend Molina's office staff field trip to a local plantation historically manned by slaves. To this, Ms. Moore responded "I would have thought you would be used to that by now";

- Despite documented exceptional work performance, Janette was subjected to negative performance reviews by Ms. Moore that can only be explained as racially motivated; and

- Despite her decades of experience in credentialing, Janette was denied the MSC Specialist Provider position for which she applied, and the job was given to a white co-worker with less experience, which had the punitive effect of continuing to expose her to the hostile work environment.

78. That the conduct detailed in paragraph 77 of this Complaint was based on Janette's race is evidenced in the racial nature of the comments, and because Janette's white coworkers were not subjected to similar conduct.

79. The conduct detailed in paragraph 77 of this Complaint was so pervasively abusive that it altered Janette's conditions of employment when she had to be medicated for anxiety and stress related to the conduct, and forced her to seek permission to transfer to another department.

80. By the conduct detailed in paragraph 77 of this Complaint, Molina intentionally deprived Janette of the same rights enjoyed by her white co-workers to the creation, performance, enjoyment of all benefits and privileges of her contractual employment relationship with Molina, in violation of § 1981, because she was made suffer a hostile and abusive work environment while white coworkers were not.

81. That the conduct detailed in paragraph 77 of this Complaint was intentional is evidenced by the racial nature of the comments, and also by the fact that Ms. Moore's assistant, Laci Thompson, advised Janette that Ms. Moore was attempting to surreptitiously build a case for termination against Janette.

82. Molina knew about the hostile work environment and failed to take appropriate remedial actions, when it did decidedly nothing.

83. Molina directly created or participated in the creation of the hostile and abusive work environment, exhibited gross negligence in supervising Ms. Moore who directly created the hostile and abusive work environment, and failed to take action upon receiving information about a hostile and abusive work environment that was occurring in violation of § 1981.

84. As a result of Molina's discrimination in violation of § 1981, Janette suffered the adverse employment actions of pretextual disciplinary write-ups and ultimately termination.

85. Janette suffered lost future wages and other valuable benefits and emoluments of employment, as well as enduring severe emotional distress to her detriment.

86. In its race-based discrimination in violation of § 1981, Molina has acted malice or deliberate indifference to the discrimination and hostile work environment, and Janette is therefore entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Janette prays for the following relief:

1. Judgment against Molina for actual damages, the exact amount to be proven at trial, which naturally flow from Molina's statutory violations of Title VII and § 1981 and tortious conduct;

2. Judgment against Molina for emotional distress, including but not limited to the depression, anxiety, stress and humiliation that arises from a racially hostile work environment, and medical expenses reasonably incurred in the treatment of, and lost wages attendant to, that depression, anxiety, stress and humiliation; the exact amount to be determined at trial;

3. Judgment against Molina for punitive damages, the exact amount to be proven at trial, for its reckless and intentional acts and omissions;

4. Judgment against Molina for Janette's reasonable attorney's fees and costs pursuant to Title VII and § 1981; and

5. For such other relief that the Court deems just and equitable.


Dated: July 5, 2018								Respectfully submitted,

/s/Molly R. Hamilton Cawley
Molly R. Hamilton Cawley
(Fed ID#11838)
Casey M. Martens
(Fed ID#12812)
MHC LAW, LLC
1250 Folly Road
Charleston, SC 29412
Tel: (843) 225-8651
Email: molly@mhc-lawfirm.com
Email: casey@mhc-lawfirm.com
*Attorneys for Plaintiff*


## VERIFICATION

I, Molly R. Hamilton Cawley, declare as follows:

I am the attorney for Plaintiff and have read the foregoing Amended Complaint with Jury Demand and know the contents thereof. I am informed and believe that the matters stated therein are true and, on that ground, allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of July, 2018, at Charleston, South Carolina.

/s/Molly R. Hamilton Cawley
Molly R. Hamilton Cawley

16